**CREATIVE DEMOS, INC., Plaintiff– Appellant, Cross–Appellee,**

**v.**

**WAL–MART STORES, INC., Defendant– Appellee, Cross–Appellant.**

**Nos. 97–1356, 97–1556.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 31, 1997.

Decided April 8, 1998.

George W. Hopper (argued in 97–1356 & 97–1556), Mark R. Galliher (in 97–1556), Hopper & Galliher, J. Lee McNeely, McNeely, Stephenson, Thopy & Harrold, Shelbyville, IN, for Plaintiff–Appellant.

Thomas L. Davis (argued), Locke, Reynolds, Boyd & Weisell, Indianapolis, IN, for Defendant–Appellee.

Before FLAUM, EASTERBROOK, and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Wal-Mart acquired 28 food stores owned by Wholesale Club, Inc., and afterward operated them under the Sam's Club trade name. Creative Demos had been engaged by Wholesale Club to perform food demonstrations in the stores, but it does not argue that any obligations were transferred from Wholesale Club to Wal–Mart. During January 1991, the month before Wal–Mart took over, Denise Baustert (Wal–Mart's "sales enhancement manager") told Creative Demos that Wal–Mart would use its services through September 1991, after which Wal–Mart would conduct demonstrations in-house.

In the event, however, Wal–Mart replaced Creative Demos in March, and this litigation under the diversity jurisdiction ensued. The parties agree that it is governed by the law of Indiana.

A jury awarded Creative Demos more than $7 million on account of this early termination. The district court reduced the award to $681,263, with a series of conditional new-trial orders if we should disagree with this calculation. 955 F.Supp. 1032 (1997). To make things manageable, we describe each of Creative Demos' claims separately. To anticipate the bottom line: Creative Demos is entitled to $137 plus a new trial on a claim of unjust enrichment.

■ **1. Contract.** The district court granted summary judgment to Wal–Mart on Creative Demos' claim that Baustert's statement created a contract for a definite term. Creative Demos worked for Wholesale Club without a legally enforceable contract and continued that arrangement with Wal–Mart. The court observed that Wal–Mart and Creative Demos never reached agreement on (indeed, never discussed) issues such as whether Creative Demos' work could be terminated on Wal–Mart's subjective dissatisfaction or whether, instead, "good cause" from an objective perspective would be required. Many other terms also were left open—one that becomes important later is whether Wal–Mart or Creative Demos owned information such as the schedule of future demonstrations. The district judge pointed out that "Creative Demos never memorialized any alleged agreement in writing; nor did [it] refer to the existence of any agreement upon being terminated by Sam's Club". We therefore agree with the district court that there was no material dispute requiring resolution at trial.

■ **2. Promissory Estoppel.** The jury concluded that Creative Demos is entitled to $681,126 on a claim of promissory estoppel—essentially, that Baustert's statement in January 1991 led Creative Demos to rely on an expectation of conducting demonstrations through September. The award is the jury's estimate of the profits Creative Demos lost because of early termination. One problem with this part of the verdict is

that in Indiana, as in most other states, promissory estoppel does not support lost-profits damages. The proper remedy is the amount necessary to restore the injured party to the position it would have occupied had the promise not been made. *First National Bank of Logansport v. Logan Mfg. Co.*, 577 N.E.2d 949 (Ind.1991); E. Allan Farnsworth, I *Farnsworth on Contracts* § 3.26a (1990). Because Creative Demos was making substantial profits conducting the food demonstrations, the district judge concluded that the damages were zero—which was another way of saying that the evidence did not permit a reasonable person to conclude that Creative Demos had relied on Baustert's statement to its detriment. 955 F.Supp. at 1037–38. Detrimental reliance is an essential element of promissory estoppel in Indiana. *Muncie Industrial Revolving Loan Fund Board v. Indiana Construction Corp.*, 583 N.E.2d 769, 771–72 (Ind.App.1991); *Hearing & Speech Clinic of Evansville, Inc. v. Indiana Department of Welfare*, 466 N.E.2d 462 (Ind.App.1984).

Creative Demos actually relied on the promise: it hired and trained additional workers, scheduled and performed demonstrations, and so on. But did this reliance work to its detriment? Given the substantial profits Creative Demos was making, reliance was beneficial rather than detrimental. Had Baustert said something like "you're welcome to continue performing food demonstrations, but Wal–Mart reserves the right to replace you at its discretion", Creative Demos would have done exactly what it did. Creative Demos was at least $60,000 and perhaps as much as $288,000 better off by working through mid-March 1991 than it would have been had it quit at the end of January—and Creative Demos cannot persuasively argue that it could have saved the costs of preparing for future demonstrations, for it would have hoped to impress Wal–Mart with the quality of its work and thus persuade it to extend the arrangement. The district court's reasoning was sound, and the verdict on the promissory estoppel claim therefore cannot stand.

■ **3. Fraud.** On March 1, 1991, and again on March 5, Baustert asked Creative Demos to send her schedules of whatever demonstrations Creative Demos had set up for the coming months.

When asked why Sam's Club wanted these documents, Baustert represented that the documents were needed so that Sam's Club could compare them against its own documents to confirm that various food vendors had fulfilled their commitment to participate in food demonstrations and to coordinate dates and locations of scheduled demonstrations with local store managers. Creative Demos shipped the requested documents by overnight delivery on March 6, 1991. On March 7, 1991, Sam's Club notified Creative Demos by fax that their demonstration services were being terminated at nineteen of the Sam's Club stores as of March 15, 1991, and that their services at the remaining nine stores would be terminated shortly thereafter. In fact, according to testimony developed at trial, by March 1, Baustert had decided to terminate Creative Demos, and had contacted another demonstration company, Sales Talk, to ask if it would be willing and able to take over the food demonstrations for the twenty-eight former Wholesale Clubs as of March 15.

955 F.Supp. at 1036. The jury concluded that Baustert had defrauded Creative Demos into sending these schedules, and it awarded $137 in actual damages (the cost of copying and sending the papers) plus $6.5 million in punitive damages. On post-trial motions the district judge held that the award of actual damages is supported by the evidence, *id.* at 1039–40, but that Indiana law does not permit any punitive award under these circumstances, *id.* at 1041. Once again the district court's decision is sound.

Baustert lied; of that there is no doubt. She testified at trial that Wal–Mart was entitled to the documents (the demos took place on its property, after all, and required coordination so that the stores would have adequate supplies of the products being demonstrated and could satisfy the demand that the demos were designed to create) but the jury could have concluded from Baustert's testimony (and that of her immediate superior) that Wal–Mart feared that if Baustert told Creative Demos the truth it would try to charge for the information or, worse, walk away in a huff and leave the stores without demonstrations. To avoid giving Creative Demos this holdup power Baustert gave a false reason. If Wal–Mart were indeed legally entitled to the information, then the falsity would not support an award of damages for fraud. But the district judge held that Baustert's belief was incorrect—and precisely because Creative Demos was wrong in its contract claim. The parties never reached agreement on their respective rights. Creative Demos was an independent contractor and entitled to retain its own documents and other intellectual property, unless it had promised to share them with its employer—which, the jury was entitled to find, Creative Demos had not done. Arguments pro and con about the customs of the trade were for the jury to evaluate, and it came down with evidentiary support in Creative Demos' corner.

■ Punitive damages are another matter. In Indiana, "[p]unitive damages may be awarded only if there is clear and convincing evidence that the defendant 'acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing'." *Erie Insurance Co. v. Hickman,* 622 N.E.2d 515, 520 (Ind.1993), quoting from *Bud Wolf Chevrolet, Inc. v. Robertson,* 519 N.E.2d 135, 137–38 (Ind.1988). The district court explained that a reasonable person could not find that this standard had been met:

Baustert honestly, although mistakenly, believed that Sam's Club was entitled to the documents she requested, and that she misrepresented the purpose of her request and waited to notify Creative Demos of its termination in an effort to reduce the efforts Sam's Club would have to expend compiling and coordinating the various schedules and to ensure that the demonstrations would continue with minimal interruption when Sales Talk took Creative Demos' place. We find no evidence in the

record that would support a finding that Sam's Club's actions were malicious or intended to injure Creative Demos, or that the fraud was "not the result of mistake of law or fact, honest error or judgment, overzealousness, mere negligence, or other human failing." Accordingly, Sam's Club's motion for judgment as a matter of law with regard to the award of punitive damages on the fraud claim is granted, and the punitive damages award is vacated.

955 F.Supp. at 1041 (footnote omitted). And Creative Demos' quasi-contract theory does no better as a foundation for a punitive award, for in Indiana there are no exceptions to the rule that punitive damages may not be awarded in contract actions. *Miller Brewing Co. v. Best Beers of Bloomington, Inc.,* 608 N.E.2d 975, 981 (Ind.1993).

According to Creative Demos, a decision of the Supreme Court of Indiana more recent than any of those the district judge cited establishes that punitive damages are appropriate for *any* fraud, provided only that the fraud was established by clear and convincing evidence (as Baustert's was). But we do not read the decision this way. Here is the critical passage:

> The correct standard of review for punitive damages is whether, considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find by clear and convincing evidence that the defendant acted with malice, fraud, gross negligence or oppressiveness which was not the result of a mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing.

*Budget Car Sales v. Stott,* 662 N.E.2d 638, 639 (Ind.1996). To the extent this passage deals with the allocation of functions between judge and jury, it has no bearing on our case, for federal courts may (and do) create their own allocation of fact-finding authority. See *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 430–36, 116 S.Ct. 2211, 2221–24, 135 L.Ed.2d 659 (1996); *Mayer v. Gary Partners & Co.,* 29 F.3d 330 (7th Cir.1994). (Not that there is any difference between the allocation in Indiana and the federal courts.)

To the extent this passage deals with the substantive issue, the question is whether the phrase "which was not the result of a mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing" modifies just the word "oppressiveness" or the entire preceding list "malice, fraud, gross negligence or oppressiveness". Only if the qualifier is limited to the word "oppressiveness" would every fraud verdict in Indiana support punitive damages. Nothing in the opinion suggests that "oppressiveness" is dispositively different from "fraud". What sense would it make to say that fraud based on an honest error of judgment could support punitive damages, but that "oppressiveness" resulting from honest error could not? *Budget Car Sales* purported to restate rather than revamp the law of Indiana, and we think that the qualifying phrase applies to all four elements in the preceding list. The district court's conclusion that any reasonable juror was bound to find that Baustert made an error of judgment, based on a mistaken view of Wal–Mart's contractual rights, is sound. It is therefore unnecessary to address the court's alternative conclusion that $6.5 million is a fantastic and untenable response to Baustert's transgression.

■ **4. Unjust Enrichment.** Although Creative Demos never contended explicitly that it was entitled to recover on a restitutionary theory, the district judge observed that promissory estoppel and unjust enrichment are closely related, and that Creative Demos' best theory combined elements of fraud and estoppel into a claim that Wal–Mart was able to displace Creative Demos when it did only because it illicitly obtained the demonstration schedules and thus avoided a disruption of operations. The judge deemed the pleadings amended to reflect this theory, see Fed.R.Civ.P. 15(b), and entered judgment for $681,126—the jury's award on the promissory estoppel claim—on this newly articulated claim for relief.

■ It is hard to quarrel with the district court's decision to amend the pleadings to conform to the course of proceedings under Rule 15(b). This is really what the parties were arguing about at trial, although they

did not use the magic words. It is much harder to sustain the judge's decision to award damages under this claim without the benefit of a jury's verdict. For $681,126 was the jury's calculation of Creative Demos' lost profits, not of the sum by which Wal–Mart was unjustly enriched. When Wal–Mart replaced Creative Demos with Sales Talk in March 1991, it did not capture the profits for itself; the demonstrator's share of the returns from food demonstrations went to Sales Talk. To prevail on a claim of unjust enrichment, a person must establish "that a measurable benefit has been conferred on the defendant under circumstances in which the defendant's retention of the benefit without payment would be unjust." *Wright v. Pennamped,* 657 N.E.2d 1223, 1229–30 (Ind. App.1995). See also *Bayh v. Sonnenburg,* 573 N.E.2d 398, 408 (Ind.1991). What is the "measurable benefit" Wal–Mart received from the stratagem that secured the schedules and therefore enabled it to put Sales Talk to work sooner? Surely not $681,126.

Calculating the benefit to Wal–Mart would be complex. Suppose Baustert had said nothing to Creative Demos but told Sales Talk to get ready as soon as possible, and suppose further that having Sales Talk do the demonstrations was more advantageous to Wal–Mart then using Creative Demos (else the switch makes no sense). Then what Wal–Mart gained by the deceit was (a) the difference in Wal–Mart's daily profits with Creative Demos doing the demonstrations, versus those profits with Sales Talk doing the work, times (b) the number of days by which the transfer would have been delayed if Sales Talk had set up its own schedules with food suppliers and store managers. Suppose on the other hand that Baustert had told Creative Demos the truth on March 1. Creative Demos might have walked off in a huff, in which case Wal–Mart would have lost all profits it makes from demos until Sales Talk could have got ready unaided. But desertion was unlikely. Creative Demos was making too much money to walk away, and it has never shown any tendency to cut off its nose to spite its face. (It also had to preserve its reputation for reliable dealings if it wanted to work for other outlets.) What Wal–Mart gained from its deceit, then, was the amount it would have had to pay Creative Demos to purchase the schedules honestly.

How much could Creative Demos have charged for the information it possessed? That depends on how long it would have taken Sales Talk to arrange demonstrations itself. Preparation would have taken time, but not until October—for Baustert and Sales Talk could have learned Creative Demos' schedules from other sources. Food vendors knew the schedules (for they supplied the product to be demonstrated, and the vendors were the source of Creative Demos' compensation). Store managers also knew many of the details (for they had to ensure the presence of the products to be sold, once consumer interest had been whipped up). All Baustert and her staff had to do was spend some time on the phone with the people in the know. Some 150 vendors were involved in the demonstration program; six weeks should have been ample time to establish a new schedule. We know that Wal–Mart was willing to accept some disruption: in the month following the replacement, approximately 1,000 previously scheduled demos were not held. So the outcome of bargaining was bound to be under $681,126, though how much under depends on the resolution of disputes within a jury's province.

The district judge wrote: "In the alternative, should the Court of Appeals determine that this figure is not an appropriate measure of unjust enrichment damages, we **conditionally** order a new trial to determine the amount of damages due Creative Demos for unjust enrichment." 955 F.Supp. at 1046 (boldface in original). Wal–Mart protests that there is no evidence that it received *any* benefit from its maneuvering, but that's unrealistic. Baustert lied to Creative Demos in order to produce some benefit for her employer; the only question is how much. (Wal–Mart does not contend that hindsight shows that replacing Creative Demos was a blunder, and that the firm was impoverished rather than enriched by the transition to Sales Talk.) Answering the question "how much?" requires a trial, at which the jury will be instructed that Wal–Mart's liability has been established and that the only subject for decision is the extent of Wal–Mart's un-

just enrichment. The district judge then should add $137 to the second jury's verdict and enter a single final judgment.

The judgment of the district court is vacated, and the case is remanded for further proceedings consistent with this opinion.