# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 01-2096

———————

| | | |
|---|---|---|
| Larry R. Romine, on behalf of himself and all others similarly situated, et al., | * * * | |
| Plaintiffs - Appellants, | * * | Appeal from the United States District Court for the |
| v. | * * | Eastern District of Arkansas. |
| Acxiom Corporation, et al., | * * | |
| Defendants - Appellees. | * | |

———————

Submitted: December 12, 2001

Filed: July 15, 2002

———————

Before LOKEN and BYE, Circuit Judges, and BOGUE,* District Judge.

———————

LOKEN, Circuit Judge.

On July 23, 1999, publicly held Acxiom Corporation and the Pritzker Foundation, a substantial Acxiom shareholder, sold 5,421,000 shares of Acxiom common stock in a secondary public offering at $27 per share. Prior to the offering, Acxiom filed a Registration Statement/Prospectus (the "Prospectus") with the Securities and Exchange Commission, as required by the Securities Act of 1933. See

———————

*The HONORABLE ANDREW W. BOGUE, United States District Judge for the District of South Dakota, sitting by designation.

15 U.S.C. § 77e(a). A narrative portion of the Prospectus entitled "Recent Developments" reported favorable results for Acxiom's fiscal quarter that ended June 30, 1999, including earnings per share of $0.18, in line with analysts' expectations. These quarterly results were echoed in a press release issued by Acxiom three days before the offering. Acxiom's stock rose to $28 1/16 on July 23, assuring a successful sale. But on August 30, an article in Barron's financial magazine expressed concern about some of Acxiom's accounting practices and increasing competition. See Barry Henderson, "Day of Reckoning for Acxiom? Critics Call its Accounting Too Frisky," Barron's, August 30, 1999. The next day, the stock tumbled to $17 3/16 on large volume, eventually falling to $16 1/8 on September 9.[1]

In April 2000, plaintiffs commenced this class action under § 11 of the Securities Act of 1933, 15 U.S.C. § 77k, alleging material misleading statements and omissions in the Prospectus. Defendants -- Acxiom and individuals who signed the Prospectus -- moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. The district court[2] granted the motion, and plaintiffs appeal. We review a Rule 12(b)(6) dismissal de novo under a stringent standard. "[A]s a practical matter, a dismissal under Rule 12(b)(6) is likely to be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir. 1982) (citation omitted). We conclude this is such a case and therefore affirm.

---

[1]Acxiom's stock recovered and reached a high of $45 per share after the class period before falling again in the recent down market.

[2]The HONORABLE JAMES M. MOODY, United States District Judge for the Eastern District of Arkansas.

# I.

Section 11 of the Securities Act of 1933 "allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement." Herman & MacLean v. Huddleston, 459 U.S. 375, 381 (1983). Section 11 imposes a stringent standard of liability to ensure that registration statements are prepared in compliance with the disclosure provisions of the Act. "To establish a prima facie § 11 claim, a plaintiff need show only that he bought the security and that there was a material misstatement or omission." In re Nationsmart Corp. Sec. Litig., 130 F.3d 309, 315 (8th Cir. 1997), cert. denied, 524 U.S. 927 (1988). The issuer's liability is "virtually absolute, even for innocent misstatements." Herman & MacLean, 459 U.S. at 382.

The district court dismissed plaintiffs' § 11 claims under Rule 12(b)(6) for failure to state a claim. A pleading issue that has divided federal courts is whether § 11 claims are "grounded in fraud" and therefore must be alleged with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. In Nationsmart, 130 F.3d at 315-16, we held that § 11 claims do not require proof of fraud and therefore the notice pleading requirements of Rule 8(a) apply, not the particularity requirements of Rule 9(b). At oral argument, Acxiom suggested that 15 U.S.C. § 78u-4(b), enacted as part of the Private Securities Litigation Reform Act of 1995, overruled Nationsmart by imposing additional requirements for pleading § 11 claims. We disagree. The structure and legislative history of that Act persuade us that § 78u-4 applies only to fraud actions brought under the Securities Exchange Act of 1934. Compare Pub. L. 104-67 § 101(a), with § 101(b), 109 Stat. 737-49; see 1995-2 U.S.C.C.A.N. 679, 705, 740. Accordingly, Nationsmart remains a controlling precedent, and plaintiffs' complaint need only comply with the short and plain statement requirements of Rule 8(a).

## II.

As relevant to this appeal, plaintiffs alleged that the favorable quarterly financial information reported in the narrative section of the Prospectus was false and misleading in three material respects:

• Earnings were inflated $.02 per share by reversing $2,300,000 in employee benefit accruals, contrary to Generally Accepted Accounting Principles (GAAP).

• Earnings were inflated another $.01 per share by reducing Acxiom's allowance for doubtful accounts "even as total receivables skyrocketed."

• Acxiom failed to disclose that a new five-year contract with its largest customer, Allstate Insurance, would result in lower pricing for Acxiom services and reflected the company's "adverse competitive environment."

In its order granting defendants' motion to dismiss, the district court separately analyzed these three alleged misstatements and concluded none was sufficient to state a § 11 claim. On appeal, the parties, too, have separately discussed whether each of the three was sufficient to support plaintiffs' § 11 claim that the Prospectus was materially misleading. We will address these disclosure issues seriatim, except to the extent their cumulative impact may become relevant.

**A. The Employee Benefit Reserves Issue.** Plaintiffs' complaint alleges that the recent quarterly earnings reported in the narrative section of the Prospectus were "materially misstated" and "presented in violation of" GAAP because, in calculating those earnings, Acxiom "improperly accounted for its reserve for employee benefits . . . by reversing $2.3 million previously accrued." Broadly construed, this claim appears to assert two distinct theories that must be analyzed separately.

1. First, plaintiffs clearly allege that Acxiom's undisclosed decision to reverse $2.3 million in employee benefit reserves violated GAAP accounting principles. Acxiom counters that this alleged accounting impropriety is immaterial as a matter of law because SEC regulations do not require that a prospectus include financial statements for a recently completed fiscal quarter, and do not require that GAAP principles be followed when reporting financial information in the narrative section of a prospectus. While not disputing those assertions, plaintiffs properly respond that, if any financial information is voluntarily included in a narrative section of a prospectus, it may not be presented in a materially misleading manner. See, e.g., 17 C.F.R. §§ 210.10-01(5), 229.303(b).

The SEC regulations provide that financial statements are presumed misleading unless prepared in compliance with GAAP principles. See 17 C.F.R. § 210.4-01(a)(1). That means investors can reasonably expect that financial information a company voluntarily includes in a prospectus, including financial forecasts or unaudited recent financial results, was prepared in accordance with GAAP. Thus, a complaint that sufficiently alleges an undisclosed departure from GAAP affecting a material statement in a prospectus almost certainly states a § 11 claim, even if the material statement appeared in a narrative section of the prospectus.

However, in this case, after generally alleging that Acxiom's improper reserves were "presented in violation of" GAAP, plaintiffs more specifically alleged that Acxiom disclosed the $2.3 million reserve adjustment in its Form 10-Q for that quarter filed with the SEC on August 16, 1999, after the secondary offering. The Form 10-Q recited that it was prepared "pursuant to the rules and regulations of the Securities and Exchange Commission," and that "the disclosures contained herein are adequate to make the information presented not misleading." Thus, plaintiffs' own complaint discloses that the quarterly financial report, including the employee benefit reserves reversal, was prepared in accordance with GAAP principles; otherwise, it would not have been prepared "pursuant to" the SEC regulations. As plaintiffs do not

-5-

challenge the Form 10-Q in this regard, their complaint does not state a § 11 claim based upon non-compliance with GAAP. "[W]hile notice pleading does not demand that a complaint expound the facts, a plaintiff who does so is bound by such exposition." Bender v. Suburban Hosp., Inc., 159 F.3d 186, 192 (4th Cir. 1998); see Hemenway v. Peabody Coal Co., 159 F.3d 255, 261 (7th Cir. 1998) ("[p]laintiffs pleaded themselves out of court on the fraud theory").

2. Second, although not clearly stated in the rambling complaint, plaintiffs appear to allege that, even if consistent with GAAP principles, the reserves reversal was unwarranted in fact. Plaintiffs further allege that this accounting adjustment was material because it caused Acxiom's reported quarterly earnings, $0.18 per share, to be overstated by $0.02 per share and thus permitted Acxiom to meet analysts' quarterly earnings expectations by means of "accounting adjustments and manipulations." We disagree.

To satisfy the § 11 requirement that a misstatement be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) (quotation omitted); see Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). "[A] complaint that alleges only immaterial misrepresentations presents an insuperable bar to relief." Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997) (quotation omitted). Though materiality is a question of fact, "a court may determine as a matter of law, that the alleged misrepresentation is immaterial," if a "reasonable investor could not have been swayed by the alleged misrepresentation." Gateway 2000, 122 F.3d at 546.

Here, the background portions of the complaint state, and the Acxiom financial statements in the record on appeal confirm, that the reserve adjustment was the result of a September 1998 merger that required Acxiom to merge separate employee

-6-

benefit plans.  A $2.3 million adjustment to employee benefit reserves would not be unusual in these circumstances.  Even if arguably unwarranted, such an adjustment would not be a material non-disclosure in the narrative portion of a prospectus reporting quarterly earnings of $15.7 million on revenues of $211.5 million, so long as the adjustment was made in accordance with GAAP principles.  In Gateway 2000, we upheld a Rule 12 dismissal because a two percent overstatement of assets by a high-risk/high-yield investment opportunity would not have significantly altered the total mix of information available to a reasonable investor.  122 F.3d at 547.  For the same reason, this § 11 non-disclosure theory was properly dismissed.

**B.  The Allowance for Doubtful Accounts Issue.**  Plaintiffs allege that Acxiom overstated the quarterly earnings reported in the Prospectus by $.01 per share when it decreased its allowance for doubtful accounts from $5.6 million to $5.2 million despite a $30 million increase in accounts receivables and an increase in its "days sales outstanding" (the average number of days it takes to collect accounts receivables), which signaled the company was having problems collecting from customers.  Relying on Gateway 2000, the district court concluded that this alleged omission was not material as a matter of law because a reasonable investor "would not have been put off" by a decrease of this magnitude.  122 F.3d at 547.  We agree.

Plaintiffs argue that the alleged doubtful accounts misstatement is material standing alone because, by inflating the most recent quarterly earnings by $.01 per share, it permitted Acxiom to meet analysts' expectations on the eve of the stock offering.  We agree that earnings trends are important to potential investors in a growth company like Acxiom; therefore, misstating income so as to meet analysts' expectations can be significant to a reasonable investor.  See Ganino v. Citizens Util. Co., 228 F.3d 154, 166 (2nd Cir. 2000).  But the allowance for doubtful accounts is a balance sheet account.  The net increase or decrease in that account over the course of a quarterly period -- here, the $400,000 upon which plaintiffs exclusively focus -- reflects a combination of additions charged to costs and expenses minus net bad debts

written off during the period. Only the additions charged to costs and expenses affect earnings and reflect the company's estimate of doubtful accounts resulting from sales for that accounting period. Plaintiffs do not allege what those additions were for the quarter ending June 30, 1999, nor do they allege that those additions were insufficient based upon Acxiom's accounts receivable and days sales outstanding for that period, nor do they allege that Acxiom made a non-recurring adjustment to the account during that quarter that directly affected quarterly earnings. In fact, Acxiom's additions charged to costs and expenses totaled $3,323,000 for that calendar quarter. In these circumstances, plaintiffs' allegation that a net change of $400,000 in the allowance account caused the earnings reported in the narrative portion of the Prospectus to be materially misleading fails to state a § 11 claim.

**C. The Allstate Contract Issue.** The SEC regulations require disclosure of "[t]he name of any customer and its relationship, if any, with the registrant or its subsidiaries" if sales to the customer are "equal to 10 percent or more of the registrant's consolidated revenues and the loss of such customer would have a material adverse effect on the registrant." 17 C.F.R. § 229.101(c)(vii). In the Prospectus, Acxiom disclosed that its largest client, Allstate, represented 10.9% of its revenues in fiscal year 1999. The Prospectus also disclosed that "[m]any of our clients typically operate under long-term contracts" and that "approximately 51% of our revenue was derived from long-term contracts" in fiscal 1999. It did not disclose that on April 1, 1999, Acxiom and Allstate had entered into a new five-year Data Management Outsourcing Agreement. However, a copy of the new Allstate contract was attached to Acxiom's Form 10-K for fiscal 1999, which was filed with the SEC on June 21, 1999, and incorporated by reference in the July 23 Prospectus.

Plaintiffs' complaint alleges that the Prospectus was materially misleading because it failed to disclose that the new Allstate contract "would result in lower pricing for traditional services performed by Acxiom" and "represented a negative trend for Acxiom in that the price reductions were reflective of the adverse

-8-

competitive environment in which Acxiom was working." Plaintiffs supported these allegations by quoting from Acxiom's August 16 Form 10-Q:

> Services segment revenues grew 34% when compared to the first quarter in the prior year. Allstate, the Company's largest customer generated revenues of $19.7 million, a 5% decrease from the prior year, principally due to the revised pricing under the recently signed five-year contract under which pricing has been "unbundled" which resulted in lower pricing for the traditional services performed by the Company in support of the underwriting area.

and by quoting from the August 30 Barron's article, which reported that "[o]bservers say" the Allstate contract was "proof" Acxiom "is facing stiff new pricing pressure from competitors," and then detailed two pricing changes which "make it clear that the company's business with Allstate won't be as profitable as it has been."

The district court concluded that Acxiom disclosed all material facts about the Allstate contract, noting that "[a] company has no duty to disparage its own competitive positions in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's conditions and the value of its stock." In re Ultrafem Inc. Sec. Litig., 91 F.Supp. 2d 678, 699 (S.D.N.Y. 2000) (citation omitted). We agree. A five percent decline resulting in gross revenues of $19.7 million from Allstate means that the decline was $1.036 million, which is not a material decline under Gateway 2000 for a company whose quarterly revenues totaled $211 million and whose total revenues from that segment of its business increased 34%. Citing the Barron's article, plaintiffs argue that Acxiom was required to describe the details of the Allstate contract because it reflected a negative trend that Acxiom reasonably should have expected to materially

impact its future revenues and income.  See 17 C.F.R. § 229.303(a)(3)(ii).[3]  But one individually negotiated contract with a major customer does not establish or even effectively allege a competitive trend, particularly here, where the Barron's author attributed his information about increased competition to "observers" and "short-sellers," and Acxiom disclosed that its business was highly competitive in both the Prospectus and, in greater detail, its June 21 Form 10-K.

In these circumstances, we conclude that Acxiom's failure to describe the expected impact of the new Allstate contract did not make the Prospectus materially misleading.  Acxiom obviously believed that long-term contracts in general, and the new Allstate contract in particular, were in its best business interests.  The five-year contract had been in effect for three months and its long-term impact on revenues and earnings was speculative at best.  The Prospectus made no affirmative representations concerning this contract and incorporated by reference Acxiom's recently filed Form 10-K, where the entire contract appeared as an exhibit.  While this type of incorporation by reference might not be sufficient to disclose an obviously material recent event or development, we should not lightly subject companies to § 11 liability for failing to describe or predict the possible impact of specific customer contracts.  As the Supreme Court said in TSC Industries, 426 U.S. at 448-49:

> Some information is of such dubious significance that insistence on its disclosure may accomplish more harm than good. . . . [N]ot only may the corporation and its management be subjected to liability for insignificant omissions or misstatements, but also management's fear of exposing itself to substantial liability may cause it simply to bury the

---

[3]Great care must be used in applying this general principle.  "While § 229.303(a)(3)(ii) provides that 'known trends or uncertainties' be disclosed in certain SEC filings, another SEC regulation, which expressly addresses forecasts, states that forward-looking information need not be disclosed.  17 C.F.R. § 229.303(a)."  In re Verifone Sec. Litig., 11 F.3d 865, 870 (9th Cir. 1993).

shareholders in an avalanche of trivial information -- a result that is hardly conducive to informed decisionmaking.

See also Glassman v. Computervision Corp., 90 F.3d 617, 632-34 (1st Cir. 1996).

For the foregoing reasons, the judgment of the district court is affirmed.

BYE, Circuit Judge, dissenting.

Public investors rely on companies like Acxiom to report material information accurately. Perverting that information, by allegedly fudging earnings or otherwise, effectively undermines the operation of the federal securities laws and cuts against the very principles upon which the stock market's strength and success depend. Here, the plaintiffs contend Acxiom's Registration Statement/Prospectus (the "Prospectus") was false and misleading in three material respects. Because each of the three alleged materially misleading statements and omissions in the Prospectus states a claim under § 11 of the Securities Act of 1933, I respectfully dissent.

## I. Employee Benefit Reserves Issue

In the Complaint, plaintiffs allege that

Contrary to GAAP, Acxiom improperly accounted for its reserve for employee benefits to inflate the Company's earnings in the Registration Statement/Prospectus by reversing $2.3 million previously accrued and failing to adequately accrue for liabilities which were probable and the amount which Acxiom could reasonably estimate. This caused the Company's EPS to be overstated by $0.02. In addition, Acxiom's Prospectus was misleading and violated § 11, because it failed to disclose that Acxiom was only able to make its first quarter numbers by reversing $2.3 million of its employee benefits accrual.

-11-

Complaint ¶ 38.  I agree with the majority that plaintiffs assert two distinct theories under the employee benefit reserves issue: (1) Acxiom improperly reversed $2.3 million of its employee benefit reserves, in violation of Generally Accepted Accounting Principles (GAAP); and (2) Acxiom failed to disclose this reversal in its Prospectus.

As to the first theory, the majority concludes that plaintiffs' failure to challenge the Form 10-Q as violative of GAAP necessarily precludes them from stating a § 11 claim based upon non-compliance with GAAP.  Even assuming that plaintiffs' § 11 claim rises or falls on this basis, I believe plaintiffs have adequately challenged the information contained in the Form 10-Q.

In the Complaint, plaintiffs allege that, in order for Acxiom to have met its first quarter numbers, Acxiom overstated its earnings and reported them in the narrative section of the Prospectus.  Acxiom achieved those inflated results, plaintiffs allege, by improperly reversing $2.3 million of its employee benefits which had already accrued.  Of course, plaintiffs learned of the $2.3 million reversal from the Form 10-Q.  By alleging the $2.3 million reversal was improper (because it was contrary to GAAP), plaintiffs necessarily contend the information contained in the Form 10-Q violates GAAP.  The plaintiffs have more than adequately challenged the information contained in the 10-Q and have not pleaded themselves out of court.  To dismiss plaintiffs' claim because they fail to state the magic words that Acxiom's "Form 10-Q violates GAAP" is improper and inconsistent with the liberal pleading requirements of Fed. R. Civ. P. 8(a)(2).  See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984) ("A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.").

As to the second theory, the majority observes that materiality is a question of fact.  Yet it proceeds to decide, as a matter of law, that Acxiom's overstatement of its earnings by two percent would not have significantly altered the total mix of

-12-

information available to a reasonable investor. The majority concludes plaintiffs have failed to state a § 11 claim because the alleged non-disclosure was immaterial as a matter of law. I disagree.

To be actionable under the federal securities laws, misrepresentations or omissions must be material. See Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997). For an omission to be material, there must be "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Id. (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)). In this case, plaintiffs point out that, without the reversal, Acxiom's net income would have fallen by $1.5 million to $14.2 million. If earnings per share were adjusted downward to reflect this change, they would have come in at sixteen cents per share, two cents lower than the expected earnings estimate. Thus, plaintiffs allege Acxiom inflated its earnings by two percent in order to hide its failure to meet analysts' consensus earnings, effectively ensuring a successful secondary offering.

Remarkably, the majority finds, based on the background portions of the Complaint and Acxiom's financial statements, that the reserve adjustment was the result of a September 1998 merger that required Acxiom to merge separate employee benefit plans. While this may prove to be true, plaintiffs clearly have alleged the reserve adjustment was aimed at inflating Acxiom's earnings so that it could meet its expected earnings at the time of the offering. At this preliminary stage of the litigation, we must accept plaintiffs' allegations as true. See Abels v. Farmers Commodities Corp., 259 F.3d 910, 916 (8th Cir. 2001).

The majority ultimately concludes that Acxiom's failure to disclose the two percent overstatement of earnings is immaterial as a matter of law. It relies on Gateway 2000, which upheld a Rule 12 dismissal because a two percent overstatement of *assets* by a high-risk/high-yield investment opportunity would not

have significantly altered the total mix of information available to a reasonable investor. Here, however, we are not dealing with assets, but rather an overstatement of two percent of *earnings*. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 n.9 (3rd Cir. 1997) (explaining that earnings reports are among the pieces of data that investors find most valuable in making their investment decisions).

Moreover, like the Second Circuit, I find the Securities and Exchange Commission's (SEC) Staff Accounting Bulletin (SAB) No. 99 to be a persuasive guide in evaluating the materiality of an alleged misrepresentation. See Ganino v. Citizens Util. Co., 228 F.3d 154, 163 (2nd Cir. 2000) (recognizing that SAB No. 99 does not carry the force of law, yet is nonetheless persuasive in evaluating the materiality of an alleged misrepresentation). In SAB No. 99, the SEC commented that "[q]ualitative factors may cause misstatements of quantitatively small amounts to be material," including "whether the misstatement masks a change in earnings or other trends," or "the misstatements hides a failure to meet analysts' consensus expectations for the enterprise." SAB No. 99, 64 Fed. Reg. 45150, 45152 (1999). This is precisely why the plaintiffs allege Acxiom manipulated its earnings—to meet analysts' consensus expectations.

Additionally, we must not forget the market's response to the information considered by the majority to be immaterial as a matter of law. At the time of the offering, Acxiom stock sold at $27 per share, but following the Form 10-Q and the Barron's article, which disclosed the information, Acxiom stock dropped to $17 per share. See Oran v. Stafford, 226 F.3d 275, 285 (3rd Cir. 2000) (suggesting that the materiality of the undisclosed information was confirmed by, among other things, a four percent drop in share prices on September 17, the day The New York Times and The Wall Street Journal reported it).

## II.    The Allowance for Doubtful Accounts Issue

Plaintiffs allege Acxiom overstated the quarterly earnings reported in the Prospectus by $.01 per share when it decreased its allowance for doubtful accounts from $5.6 million to $5.2 million despite a $30 million increase in accounts receivables and an increase in its "days sales outstanding."  Plaintiffs allege this information is material because it permitted Acxiom to meet analysts' expectations on the eve of the stock offering.

The majority acknowledges that earnings trends are important to potential investors in a growth company like Acxiom and, therefore, misstating income to meet analysts' expectations can be significant to a reasonable investor.  <u>Ante</u> at 7.  The majority, however, proceeds to scrutinize the Complaint, faulting the plaintiffs for not adequately particularizing specific facts, <u>id.</u>, despite concluding that plaintiffs are not subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b).  Plaintiffs have clearly complied with Rule 8(a)(2) by alleging "Acxiom's Prospectus was misleading because it failed to disclose that despite a $30 million increase in accounts receivable and an increase in days outstanding, Acxiom decreased its allowance for doubtful accounts from $5.6 million to $5.2 million."  Complaint ¶ 39.  This allegation, coupled with the allegation contained in ¶ 42 of the Complaint (alleging quarterly earnings were overstated by $.01 per share due to Acxiom's failure to record reserves adequately for uncollectible receivables), sufficiently states a claim under § 11.

The Supreme Court recently articulated the purpose of Rule 8(a)(2), explaining

> a complaint must include only a short and plain statement of the claim showing that the pleader is entitled to relief.  Such a statement must simply give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.  This simplified notice pleading standard relies on liberal discovery rules and summary judgment

motions to define disputed facts and issues and to dispose of unmeritorious claims.

Swierkiewicz v. Sorema N.A., 122 S. Ct. 992, 998 (2002) (internal quotations and citations omitted).  In dismissing this claim under Rule 12(b)(6), the majority snubs the spirit of the liberal pleading requirements of Rule 8(a).

## III.    The Allstate Contract Issue

The plaintiffs allege the Allstate contract had been renegotiated in March 1999 for an additional five years, resulting in lower pricing for traditional services performed by Acxiom.  They further allege the Allstate contract represented a negative trend for Acxiom in that the price reductions reflected the adverse competitive environment in which it operated.  Plaintiffs explained that a disclosure of its significance was required for investors to fully understand the state of Acxiom's business and worth of its stock.  After all, Allstate was Acxiom's largest client in 1999, representing 10.9% of its revenues for fiscal year 1999.

The majority agrees with the district court that "[a] company has no duty to disparage its own competitive positions in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's conditions and the value of its stock."  Ante at 9.  The plaintiffs allege, however, that Acxiom did not reveal the hard data—the Prospectus omitted any discussion or description of the new contract's actual impact on first quarter results.  The majority then notes the Prospectus made no affirmative representations concerning this contract.  But the plaintiffs' claim with respect to the Allstate contract relates to Acxiom's failure to disclose, not affirmatively misrepresent, material information.

-16-

Moreover, the plaintiffs allege Acxiom was required to describe the details of the Allstate contract because it reflected a negative trend that Acxiom reasonably should have expected to materially impact its revenues and income. 17 C.F.R. § 229.303(a)(3)(ii) requires a registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Here, the plaintiffs allege Acxiom knew the impact of the renegotiated contract with Allstate, at least as it pertained to the first quarter results. They also allege Acxiom knew the renegotiated contract was reasonably likely to have material effects on its financial condition or results of operation. That is, the Allstate contract "would result in lower pricing for traditional services, and represented a negative trend in that price reductions were reflective of the adverse competitive environment in which Acxiom was working." Complaint ¶ 25(e)-(f). The majority nonetheless determines that "one individually negotiated contract with a major customer does not establish or even effectively allege a competitive trend . . . ." Ante at 9. Granted, this claim relates only to the renegotiated contract with Allstate, but Allstate was Acxiom's single largest customer and the renegotiated contract was effective for five years.[4] This certainly could have a negative trend in pricing. Even the sophisticated financial analyst who wrote the article in Barron's noted the renegotiated Allstate contract reflected a more general pricing pressure, under which Acxiom "has been straining its balance sheet to keep up with the earnings growth that it's been promising Wall Street," and observed further that "[t]he terms of this contract, . . .

---

[4]According to the SEC's 1989 release interpreting 17 C.F.R. § 229.303(a)(3)(ii), "[r]equired disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product process; erosion in the registrant's market share; changes in insurance coverage; or the *likely* non-renewal of a material contract." Management's Discussion and Analysis of Financial Condition, Securities Act Release No. 6835, 54 Fed. Reg. 22,427, 22,429 (May 24, 1989) (emphasis added).

make it clear that the company's business with Allstate won't be as profitable as it had been."  Complaint ¶ 30 (quoting <u>Barron's</u> article).

Because each of the three alleged materially misleading statements and omissions in the Prospectus states a claim under § 11 of the Securities Act of 1933, I would reverse the judgment of the district court.  I respectfully dissent.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.