Susan MARTINO–CATT, Plaintiff,

v.

E.I. DUPONT NEMOURS AND COM-
PANY and Pioneer Hi–Bred Inter-
national, Inc., Defendants.

No. 4:02–CV–90500.

United States District Court,
S.D. Iowa,
Central Division.

April 29, 2004.

Michael W. Thrall, Frank B. Harty, Nyemaster Goode Voigts West Hansell & O'Brien PC, Michael J. Carroll, Babich Goldman Cashatt & Renzo PC, Des Moines, IA, for Plaintiff.

Terri L. Combs, Faegre & Benson LLP, Des Moines, IA, Robert L. Schnell, Jr., John B. Gordon, Deborah A. Ellingboe, Faegre & Benson, Minneapolis, MN, for Defendants.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Plaintiff Susan Martino–Catt filed this action on September 27, 2002 against Defendants E.I. duPont Nemours and Company ("DuPont") and Pioneer Hi–Bred International, Inc. ("Pioneer"), alleging violations of federal and state securities laws, as well as common law fraud claims, in connection with the sale by Defendants to Dr. Martino–Catt of options to purchase DuPont stock while she was an employee of Pioneer. On October 24, 2002, Defendants filed a Motion to Dismiss two counts of Plaintiff's Complaint as insufficient under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, 109 Stat. 737, and Federal Rule of Civil Procedure 9(b). In a February 20, 2003 Order, the Court granted Defendants' motion to dismiss without prejudice, granting Plaintiff leave to amend her Complaint.

On March 18, 2003, after answering Plaintiff's original Complaint, Defendants filed a Motion to Dismiss additional counts of the Complaint. The Court allowed Plaintiff to file an Amended Complaint before ruling on Defendants' second motion. Subsequent to Plaintiff's filing of her Amended Complaint, Defendants' supplemented their second Motion to Dismiss, renewing the challenges already raised and adding challenges to the claims that were amended by Plaintiff pursuant to the Court's February 20, 2003 Order. The Court's June 9, 2003 Order ruling on Defendants' second Motion to Dismiss dismissed certain claims without leave to amend, granted Plaintiff leave to amend portions of the Amended Complaint consistent with that Order, and found certain of Plaintiff's claims pre-empted by the Employee Retirement Income Security Act of 1974 ("ERISA"). On June 30, 2003, Plaintiff filed a Second Amended Complaint, alleging federal and state securities law violations, violations of this Court's orders in *Bublitz v. E.I. duPont de Nemours & Co.*, Civil No. 4:00–cv–90247, and breach of fiduciary duty under ERISA.

On September 4, 2003, Defendants filed a Motion for Summary Judgment, requesting that the Court grant summary judgment to Defendants on all counts alleged in Plaintiff's Second Amended Complaint. For the reasons discussed below, Defendants' motion is **granted**.

## I. FACTUAL BACKGROUND

This action is part of a long history of litigation arising out of the merger of Defendants Pioneer and DuPont. Pursuant to an agreement entered into on March 15,

1999, Defendant Pioneer became a subsidiary of Defendant DuPont. The merger was consummated on approximately October 1, 1999. Prior to the time of the merger, Pioneer had adopted the Pioneer Hi–Bred International, Inc. Change in Control Severance Compensation Plan for Management Employees ("CIC Plan"). The CIC Plan provided, *inter alia*, that

[i]n the event of the Involuntary Termination of Employment of a Participant within three (3) years following a Change in Control, a Participant shall be entitled to receive from the Company a Severance Payment in the amount provided in [relevant sections of the Plan].

"Involuntary Termination of Employment" was defined by the Plan to include "the resignation or retirement of a Participant for Stated Good Reason." Under the CIC Plan, "Stated Good Reason" meant

a written determination by a Participant that he reasonably and in good faith cannot continue to fulfill the responsibilities for which he was employed. The Participant's determination will be conclusively presumed to be reasonable and in good faith if, without the Participant's express written consent, the Company (a) reduces the Participant's base salary or rate of compensation as in effect immediately prior to the Change in Control, or as the same may have been increased thereafter, (b) fails to continue any bonus plans in which the Participant was entitled to participate immediately prior to the Change in Control, substantially in the form then in effect, (c) fails to continue in effect any benefit or compensation plan in which the Participant is participating immediately prior to the Change in Control (or plans providing substantially similar benefits), (d) assigns to the Participant any duties inconsistent with the Participant's duties, responsibilities or status immediately prior to the Change in Control, or changes the Participant's reporting responsibilities, titles or offices, or (e) requires the Participant to change the location of his job or office, so that the Participant will be based at a location more than thirty (30) miles distant by public highway from the location of his job or office immediately prior to the Change in Control.

The *Bublitz* class action litigation, in which the class of CIC Plan participants sought a declaration of their rights under the Plan, was removed to this Court from the Iowa District Court for Polk County in May, 2000. The class sought resolution of a number of issues under the CIC Plan, including 1) whether Pioneer was in breach of the CIC Plan by requiring participants to resign in order to obtain a decision as to their eligibility under the CIC Plan (the "quit first" issue); 2) whether each participant's subjective determination that he or she reasonably and in good faith cannot continue to fulfill the responsibilities for which he or she was employed was a Stated Good Reason, or otherwise entitled that participant to receive benefits under the CIC Plan (the "easy trigger" issue); and 3) whether certain changes in compensation and bonus plans both in contemplation of the merger and after the merger took place entitled participants to benefits under the CIC Plan.

The *Bublitz* defendants, who are identical to the Defendants in this action, sought permission from this Court in September of 2000 to present a Retention Proposal to all CIC Plan participants. The Court's September 26 and September 28, 2000 Orders granted the *Bublitz* defendants' request to present the Retention Proposal and laid out the ground rules for this presentation, requiring that communications by the defendants to Retention Proposal recipients on several specified subjects be in writing.

Plaintiff was employed as a Research Coordinator in the functional genomics group by Defendant Pioneer at the time of the merger, and was a participant in the CIC Plan. As a participant in the CIC Plan, Plaintiff received a Retention Proposal packet from Defendants on September 29, 2000, which included the Retention Proposal agreement, terms and conditions of the stock option grant, a copy of a transitional severance plan, and a question-and-answer sheet regarding the Retention Proposal. The summary of the Retention Proposal included in the materials received by Plaintiff informed CIC Plan participants that

[t]his proposal provides each participant with an individual choice:

- Elect the stock option grant [offered by the Retention Proposal] and coverage under the new Transitional Severance Plan by October 18, 2000 OR
- Remain under the current CIC Severance Plan[.]

The Release Form that was included in the Retention Proposal materials and that individuals accepting the Retention Proposal were required to sign provided as follows:

I accept the Special One Time Stock Option grant as outlined above and described in the Terms and Conditions which are enclosed with this information packet. I understand that this Special One Time Stock Option grant is offered in lieu of continuing participation in the [CIC Plan]. In return for this grant, I waive any and all rights that I have or may ever have in the [CIC Plan]. Instead, I will participate in the Pioneer Transitional Severance Plan. In addition, I hereby give my written consent that, as it applies to me, the definition of "involuntary termination of employment" in each of the following plans shall be amended to be the same as the definition of such term in the Pioneer

Transitional Severance Plan: Annual Reward Plan, Gap Retirement Plan, International Pension Plan, Restricted Stock Plan, Savings Plan and the Stock Option Plan. Further, by accepting this grant, I agree never to commence any litigation or participate in any litigation—individually or as a member of a class—involving or related to the Pioneer Change In Control Severance Plan for Management Employees.

From the time she received the Retention Proposal packet, Plaintiff was generally very suspicious of the way the Defendants were handling both the Retention Proposal and the *Bublitz* litigation. When Plaintiff picked up her Retention Proposal and discussed the Retention Proposal with other CIC Plan participants, the general feel was that the Retention Proposal felt "like a pink slip rather than a retention plan;" you had to sign the Retention Proposal or you were "gone."

On September 30, 2000, Plaintiff received a notice from class counsel in the *Bublitz* litigation, which described how to obtain copies of all the legal documents relating to the *Bublitz* suit and how to contact the lawyers for additional information. On October 5, 2000, Plaintiff attended a meeting at the Nyemaster law firm, which represented the plaintiff class in *Bublitz,* at which the legal team presented various information related to the ongoing class action lawsuit and the retention proposal and fielded questions from the audience related to both those items. At the meeting, the Nyemaster attorneys offered to submit on behalf of meeting attendees specific questions to the DuPont legal team for clarification. On October 10, 2000, Plaintiff met individually with Brent Appel, a lawyer who was recommended to her by a colleague at Pioneer, in order to discuss the Retention Proposal.

Plaintiff found the decision-making process difficult because of what she perceived as the risk associated with accepting the Retention Proposal. Specifically, Plaintiff was concerned about three major issues: 1) the definition of "stated good reason" in the severance plan associated with the Retention Proposal had been narrowed significantly, allowing DuPont "a lot of leeway to change [Plaintiff's] job even more than it already had," in a way that would not necessarily be satisfying to Plaintiff; 2) the value of the stock options she was being offered was not guaranteed; and 3) the number of options she was to receive was calculated in a manner that was disadvantageous to Plaintiff because of a recent salary increase.

As of approximately October 10, 2000, Plaintiff had made a "very firm decision" not to sign the retention proposal. Plaintiff had looked through the proposal, spoken with an attorney, had conversations with her spouse,ꞏ and had come to the "very clear conclusion" that it was not in her best interests to sign the Retention Proposal. On October 13, 2000, however, Plaintiff had conversations with Tony Cavalieri, Vice President and Director of the Trait and Technology Department and Plaintiff's self-described mentor at Pioneer, and Donna Ramaeker Zahn, a research communications manager at Pioneer and friend of Plaintiff's outside of work, that resulted in her deciding to sign the Retention Proposal.

On October 15, 2000, Plaintiff signed the Retention Proposal. Plaintiff understood at the time she signed the Retention Proposal that she was thereby waiving her right to participate in the then-ongoing class action litigation regarding participants' rights under the CIC Plan. Additionally, Plaintiff understood that when she signed the Retention Proposal she was forfeiting her rights under the existing CIC Plan. Plaintiff also knew that Defen-

dants' interpretation that the CIC Plan did not have an "easy trigger," as well as Defendants' policy of requiring employees to quit prior to receiving a determination of eligibility under the CIC Plan were at issue in the then-ongoing class action litigation.

## II. SUMMARY JUDGMENT

### A. The Legal Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is genuine "if the evidence is such .that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if the dispute over it might affect the outcome of the ꞏsuit under the governing law. *Id.*

██ The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In meeting its burden, the moving party may support his or her motion with affidavits, depositions, answers to interrogatories, and admissions. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate the specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(c), 56(e); *Celotex Corp.,* 477 U.S. at 322–323, 106 S.Ct. 2548;

*Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. The role of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts University School of Medicine,* 976 F.2d 791, 794 (1st Cir.1992) (citations omitted). In order to survive a motion for summary judgment, the non-moving party must present enough evidence for a reasonable jury to return a verdict in his or her favor. *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505.

On a motion for summary judgment, the Court is required to "view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences." *United States v. City of Columbia,* 914 F.2d 151, 153 (8th Cir.1990). The Court does not weigh the evidence or make credibility determinations. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Id.*

### B. ERISA Claims

On October 15, 2000, at the time Plaintiff decided to accept the terms of Defendants' Retention Proposal, she signed a release indicating that, in return for the one-time grant of stock options, she agreed to

> waive any and all rights that I have or may ever have in the Pioneer Change In Control Severance Plan For Management Employees ... Further, by accepting this grant, I agree never to commence any litigation or participate in any litigation—individually or as a member of a class—involving or related to the Pioneer Change In Control Severance Plan for Management Employees.

Defendants argue that Plaintiff knowingly and voluntarily released any potential claims alleging mismanagement of the CIC Plan or seeking benefits under the CIC Plan, as any such claims involve or relate to the CIC Plan. Accordingly, Defendants argue that Counts V and VI of Plaintiff's Second Amended Complaint, alleging that Defendants breached their fiduciary duties under ERISA in managing the CIC Plan and seeking Plaintiff's reinstatement into and benefits under the CIC Plan, are barred by the release. Plaintiff, however, argues that her release of claims in conjunction with her acceptance of the Retention Proposal does not operate to bar her ERISA claims because the release was not entered into knowingly and voluntarily. She argues that certain conduct of Defendants improperly induced her to sign the release.

#### 1. Knowing and Voluntary Release

 Generally speaking, an ERISA beneficiary can release a fiduciary from liability if the potential claims are knowingly and voluntarily released. *Leavitt v. Northwestern Bell Telephone Co.,* 921 F.2d 160, 162 (8th Cir.1990). The Eighth Circuit has held that in order to determine whether a release of ERISA claims is knowing and voluntary, general principles of contract construction are applied. *Id.* However, since ERISA involves principles of trust law, "we must examine the totality of circumstances in which the release was signed to ensure the fiduciary did not obtain the release in violation of its duties to the beneficiary." *Id.* In applying these principles, there are a number of factors to consider: (1) the beneficiary's education and business experience; (2) the beneficiary's input in negotiating the terms of the settlement; (3) the clarity of the release language; (4) the amount of time the beneficiary had for deliberation before signing the release; (5) whether the beneficiary read the release and considered its terms before signing it; (6) whether the beneficiary knew of his or her rights under the

plan and the relevant facts when he or she signed the release; (7) whether the beneficiary was given an opportunity to consult with an attorney before signing the release; (8) whether the beneficiary received adequate consideration for the release; and (9) whether the beneficiary's release was induced by improper conduct on the part of the employer. *Id.* As the party asserting the affirmative defense of release of ERISA claims, Defendants bear the burden of proving that the elements of release are satisfied. *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002); *Auslander v. Helfand*, 988 F.Supp. 576, 580 (D.Md.1997).

### a. Plaintiff's Education and Business Experience

The undisputed evidence indicates that Plaintiff is well-educated, having received a bachelor's degree and a master's degree in Biology, and a Ph.D. in Plant Biology. After receiving her Ph.D. in 1991, Plaintiff held two postdoctoral fellow positions before beginning employment with Defendant Pioneer in approximately 1993. Before leaving her employment with Pioneer in 2002, Plaintiff had attained the position of research coordinator for the functional genomics group. Currently, Plaintiff is employed as the director of systems biology at the Virginia Bioinformatics Institute.

### b. Plaintiff's Input in Negotiating the Terms of the Settlement

It is undisputed that Plaintiff had no input in negotiating the terms of the release she signed in conjunction with her acceptance of Defendants' Retention Proposal. Plaintiff, as a participant in the CIC Plan, received a Retention Proposal packet from Defendants on September 29, 2000. This packet contained the release form that Plaintiff ultimately executed.

### c. Clarity of Release Language

■ The release language clearly indicates that Plaintiff waives "any and all rights that I have or may ever have in the Pioneer Change In Control Severance Plan For Management Employees." The release further indicates that "by accepting this grant, I agree never to commence any litigation or participate in any litigation—individually or as a member of a class—involving or related to the Pioneer Change In Control Severance Plan For Management Employees." The Court finds this language exceedingly clear, especially as it relates to Plaintiff's claim that Defendants breached their fiduciary duties under ERISA. Although the release does not specifically mention ERISA, it need not do so, as general "any-and-all language covers a claim for ERISA benefits." *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 373 (5th Cir.2002). The Court does not credit the Plaintiff's assertion that "it would have been entirely unclear to Dr. Martino–Catt and others signing the release that they were waiving any and all rights to forever bring any claims under ERISA." Dr. Martino–Catt was personally advised by an attorney in her decision about whether to accept the Retention Proposal. Additionally, she attended at least one meeting held by the Nyemaster law firm, counsel for Plaintiffs in the *Bublitz* action, where the Retention Proposal was discussed.

### d. Amount of Time Afforded Plaintiff for Deliberation; Plaintiff's Review of the Release and Consideration of Its Terms Prior to Signing; and Plaintiff's Opportunity to Consult with Counsel

Plaintiff was presented with the Retention Proposal on September 29, 2000 and was instructed that she must make a decision as to whether to accept it no later

than October 18, 2000. Plaintiff therefore had 26 days to consider the proposal. This Court's September 26, 2000 Order in the *Bublitz* litigation required that "[a]ny offer by Defendants entailing a request to waive rights under the CIC Plan must give putative class members at least ten days to respond." Thus, the 26 days provided by the Defendants were more than sufficient to allow a full consideration of the terms of the Retention Proposal by putative class members, including Plaintiff.

On September 30, 2000, Plaintiff received a notice from class counsel in the *Bublitz* litigation describing how to get copies of all the legal documents relating to *Bublitz* and how to contact the lawyers for additional information. On October 5, 2000, Plaintiff attended a meeting at the Nyemaster law firm at which the *Bublitz* legal team presented information related to the ongoing class action lawsuit and the Retention Proposal and fielded questions from the audience related to both items. At that meeting, the *Bublitz* legal team offered to submit on behalf of CIC Plan participants any specific questions to the DuPont legal team for clarification.

On October 10, 2000, Plaintiff met individually with Brent Appel, a lawyer she was referred to by a co-worker, to discuss the Retention Proposal.

In addition, both before and after she received the Retention Proposal from Defendants, Plaintiff had discussions with fellow CIC Plan participants about the Retention Proposal.

### e. Adequate Consideration for the Release

In exchange for the release, Plaintiff received a one-time grant of 29,100 DuPont stock options. The options were to fully vest on October 1, 2002.

Plaintiff argues that her agreement to release all claims upon acceptance of the Retention Proposal was not supported by adequate consideration because the options were not worth more than the benefits that Plaintiff might have received had she opted to attempt to receive the CIC Plan benefits. This argument is based on the fact that the number of stock options the Plaintiff received under the Retention Proposal was calculated at less than three times her current salary at the time the Retention Proposal was formally offered. Plaintiff complains that, although Defendants purported to calculate the number of options under the Retention Proposal based upon three times an employee's annual compensation, the date Defendants chose to make the calculation resulted in Plaintiff's options being calculated based upon an older, lower salary figure. Whatever the merits of this particular point, there is a larger problem with Plaintiff's argument of inadequate consideration.

At the time Plaintiff signed the release, it is undisputed that she fully understood the flexible nature of the potential payout of stock options. A receipt of stock options that do not vest immediately is inherently risky. By the time the options vest, their value may be much greater than anticipated, much less than anticipated, or somewhere between those two points. Plaintiff admits that she understood that accepting stock options would be "risky because who was to say what value, if any, those options would ever have." Further, she understood when she chose to sign the release that "DuPont stock was not doing real well." So Plaintiff fully understood that there was no guarantee that her options would ever attain the value of three times her annual salary in 2000. She must have understood, as well, that the options could, over the two year period between their granting and their vesting, increase dramatically in value, leading to a payout much greater than three times her annual compensation.

The decision in *Chaplin v. NationsCredit Corp.*, 307 F.3d 368 (5th Cir.2002), aptly illustrates the dilemma with which Plaintiff was confronted. In that case, the Fifth Circuit decided that surrendering a disputed right to a bigger payment for a certain right to a smaller payment does constitute adequate consideration. *Id.* at 374. The *Chaplin* panel summarized the situation in that case as follows:

> '[P]laintiffs were given a choice: to accept severance benefits at the time of their termination and sign a Release, or to wait and dispute their eligibility under the 1995 plan. Without exception, plaintiffs chose to take the severance benefits when offered at the time of their termination.' They cannot complain now that the severance package they freely accepted in lieu of protracted litigation over plan benefits is inadequate consideration.

*Id.* at 375 (quoting the district court's opinion below); *see also Warnebold v. Union Pac. R.R.*, 963 F.2d 222, 223–24 (8th Cir. 1992) (where plaintiff had only a contested right to claimed benefits, a cash payment for less than the full value of plaintiff's claims constituted adequate consideration). Plaintiff in this action was presented with a similar dilemma. She knew that there was a class action lawsuit ongoing that addressed eligibility for benefits under the CIC Plan. She took the opportunity to meet with counsel representing the potential class in that litigation in order to discuss both that litigation and the Retention Proposal being offered as an alternative. Additionally, she met independently with another attorney to discuss the Retention Proposal. By accepting the Retention Proposal, Plaintiff knew that she was foregoing the opportunity to determine her own eligibility for benefits under the CIC Plan. Having signed the Retention Proposal with full knowledge of its risks and benefits, Plaintiff cannot now complain that the consideration she received was inadequate.

The cases that Plaintiff cites in support of the proposition that the consideration she received was not adequate are easily distinguishable. In *George v. Mobil Oil Corp.*, 739 F.Supp. 1577, 1581 (S.D.N.Y. 1990), the court found a fact issue as to whether the employee plaintiff was previously and independently eligible for the benefits that he received as consideration even without signing a claim and releasing his age discrimination claims against the defendant. Likewise, in *Bollenbacher v. Helena Chem. Co.*, 926 F.Supp. 781, 790–91 (N.D.Ind.1996), the court denied summary judgment because it found a genuine issue of fact as to whether the money given to the employee plaintiff in exchange for a release of all claims was in addition to any money to which the plaintiff was already entitled based upon his years of employment at the company. Finally, the court in *Gorman v. Earmark, Inc.*, 968 F.Supp. 58, 63 (D.Conn.1997), found a genuine issue of material fact regarding adequate consideration where a reasonable jury could have found that the money the employee plaintiff was paid to release his claims was money he was already owed by defendants in exchange for stock and various promissory notes. In all these cases, the courts were persuaded by evidence indicating that the plaintiffs might have already been entitled to money from the defendants, independent of the claims that were released by plaintiffs' waivers.

In this case, Plaintiff has presented no evidence to indicate that Defendants already owed her any sort of payment independent of any potential claims under the CIC Plan. Rather, any right to potential payment on the part of Plaintiff would have arisen solely from the terms of the CIC Plan, which Plaintiff purported to release when she accepted the Retention Proposal.

f. Plaintiff's Knowledge of Rights Under the CIC Plan and Relevant Facts; Inducement to Release Claims Based on Improper Conduct of Defendant

Plaintiff argues that these two factors are dispositive as to the validity of the release. According to Plaintiff, Defendants "embarked on a long-term, comprehensive campaign to ensure specifically that Dr. Martino–Catt did not entirely know of her rights under the CIC plan and that she did not have all facts relevant to her decision of whether to sign the Release." This campaign, according to Plaintiff, consisted of the following:

1. Defendants' failure to inform Plaintiff that they interpreted the CIC Plan to have an "easy trigger" and misrepresentations that the Plan did not contain an "easy trigger,"

2. Defendants' failure to inform Plaintiff of their belief that they had determined that events had transpired which had already triggered benefits under the CIC Plan for Plaintiff;

3. Defendants' failure to inform Plaintiff about their motives in offering the Retention Proposal; namely, to "destroy the class action lawsuit ... pending against the Defendants;"

4. Defendants' representations about the potential value of the Retention Proposal versus the CIC Plan;

5. Pressure to force Plaintiff and others to sign the release, including:

 a. Institution of the "quit first" requirement; and

 b. "[S]ubtle and berating conversations from other members of Defendants' organization," including Tony Cavalieri and Donna Ramaeker Zahn.

■ The undisputed evidence in the summary judgment record, however, demonstrates that, under the totality of the circumstances, these alleged misrepresentations and omissions do not suffice to render Plaintiff's waiver of claims unknowing and involuntary. Plaintiff's argument that she was tricked by Defendants' long-term and comprehensive campaign to deprive her of the knowledge she needed to determine her rights under the CIC Plan fails to take into account the critical and undisputed fact that Plaintiff knew that many of the misrepresentations she alleges Defendants made—most notably their representations regarding the "easy trigger" and "quit first" issues—were being challenged in the *Bublitz* litigation. As previously discussed, Plaintiff had the benefit of legal counsel, both an independent attorney she spoke with individually about the Retention Proposal and members of the Nyemaster law firm who were representing the plaintiff class in *Bublitz,* in making her decision. Where an ERISA plan participant has settled a claim involving fraud by signing a release, that individual "may not subsequently assert that he or she is not bound by the settlement because the extent of the fraud was not fully disclosed." *Finz v. Schlesinger,* 957 F.2d 78, 83 (2d Cir.1992). Although the *Bublitz* plaintiff class simply sought a declaration of rights under the CIC Plan, and did not seek damages for any fraud that constituted a breach of fiduciary duty under ERISA, Plaintiff was already aware at the time that she signed the release that Defendants interpreted the CIC Plan as not having an "easy trigger" and as requiring a participant to quit prior to receiving a determination of eligibility. Thus, the basic facts surrounding Plaintiff's ERISA fraud claims were already known to her. A participant such as Plaintiff, "who at all times believed that defendants were misrepresenting [her] entitlement to benefits, should not be permitted to strike a better bargain at this late date by claiming that [she] signed the agreement in reliance on defendants' misrepresentations." *See id.*

Similarly, Plaintiff's own testimony indicates that she did not rely on any of Defendants' alleged misrepresentations in accepting the Retention Proposal.[1] Plaintiff was generally suspicious of Defendants' handling of the Retention Proposal from the start, and had made, in her own words, a "very firm decision" prior to an October 13, 2000 conversation with Tony Cavalieri, not to sign the Retention Proposal. After Plaintiff's conversation with Mr. Cavalieri, Plaintiff's "mentor," in which he expressed his opinion that Plaintiff had a future and opportunities at Pioneer, Plaintiff testified that she told her husband that "I feel like I have no option but to sign if I intend to stay and experience these opportunities that Tony is telling me are available to me." Indeed, the undisputed evidence confirms Plaintiff's belief. Whether or not a CIC Plan participant needed to quit prior to Pioneer determining her eligibility for benefits, there is no dispute that a participant would not receive the CIC Plan severance package until after resigning. Plaintiff acknowledged as much, indicating that the CIC Plan, regardless of how it was interpreted, would never have put money in her hands until she left the company. Plaintiff's undisputed testimony indicates that she did not rely on any of the alleged misrepresentations made by Defendant, but rather on the opinion of Tony Cavalieri that she had a bright future at Pioneer, in deciding to sign the

Retention Proposal. In other words, Plaintiff signed the Retention Proposal not because of any misrepresentations Defendants made, but because she decided she wanted to keep her job at Pioneer, which was inconsistent with taking advantage of benefits under the CIC Plan.

Another factor the Court finds relevant in considering the totality of circumstances and the knowing and voluntary nature of Plaintiff's waiver is that Plaintiff did not formally voice any concerns about the waiver, which she signed on October 15, 2000, until the middle of 2002, at approximately the time when she decided to leave her employment with Pioneer. Plaintiff began to have second thoughts about accepting the Retention Proposal, which she voiced to Ms. Ramaeker Zahn, within two days of signing it. Plaintiff's deposition testimony, which is contained in the summary judgment record, indicates that she did not take steps to rescind her acceptance at the time she began to have second thoughts, however, because she hoped that the opportunities that Mr. Cavalieri spoke of would present themselves.

█ This is a unique situation where the dispute between the Plaintiff, a participant in the Defendants' ERISA plan, and the Defendants offering the plan was clearly spelled out for the Plaintiff before she executed the release of her claims. Having full knowledge that the pending *Bublitz* litigation against Pioneer and DuPont

---

1. Plaintiff argues that she "need not prove reliance to the extent she is merely using the examples of concealment and misrepresentation as indicators that the Defendants withheld information relating to her 'knowledge of rights under the plan' and information 'relevant' to her decision. The question in the knowledge/relevant analysis is not reliance, necessarily, but whether the plaintiff was given the information." The Court disagrees. The Plaintiff loses sight of the overall inquiry that is being conducted, of which the question of whether the Plaintiff had knowledge of her

rights under the plan and information relevant to her decision is simply a part. Whether Plaintiff had such information and knowledge is examined by the Court to determine whether the Plaintiff's waiver of her claims under the CIC Plan was knowing and voluntary. The Court finds that whether Plaintiff believed Defendants' misrepresentations or relied on any alleged concealment of information is highly relevant to any determination of whether Plaintiff's waiver was, under the totality of the circumstances, knowing and voluntary.

related directly to at least some of the issues that she claims constituted fraud, Plaintiff cannot be heard to complain that she signed the release under duress. She made the agreement with her eyes wide open. Even viewing the evidence in the light most favorable to the Plaintiff and giving Plaintiff the benefit of all reasonable inferences, there is no genuine issue as to any material fact such that a reasonable jury could return a verdict for Plaintiff on her ERISA claims. Defendants have established that Plaintiff's waiver of her rights under the CIC Plan was knowing and voluntary as a matter of law.

### 2. Breach of Fiduciary Duty in Obtaining Release

Plaintiff relies on *Leavitt v. Northwestern Bell Telephone Co.*, 921 F.2d 160 (8th Cir.1990), for the proposition that the Court must employ a two-prong test in determining whether a release of ERISA claims is valid and enforceable. First, according to Plaintiff, the Court must determine whether the waiver is "knowing and voluntary;" second, the Court must review the actions of the fiduciary in obtaining the release and determine whether those actions violate the fiduciary's duties to the beneficiary. *Leavitt,* however, does not separate the inquiry into two distinct parts, as Plaintiff argues. Rather, the *Leavitt* Court's articulation of the nine factors to consider in determining whether a release of ERISA claims is knowing and voluntary, *see infra* Part II.B.1, encompasses the inquiry under both of Plaintiff's prongs. *See Leavitt,* 921 F.2d at 162. For the purposes of clarity, however, the Court notes separately that the undisputed evidence indicates that Defendants breached no fiduciary duty under ERISA in obtaining Plaintiff's release of all claims in conjunction with her acceptance of the Retention Proposal.

To establish a claim for breach of fiduciary duty under ERISA based on alleged misrepresentations regarding the terms of an employee benefit plan, a plaintiff must show 1) that the defendant was acting in a fiduciary capacity when it made the challenged representations; 2) that these constituted material misrepresentations; and 3) that the plaintiff relied on those misrepresentations to their detriment. *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir.2002). As previously discussed, the undisputed evidence in this case, including Plaintiff's own testimony, demonstrates that Plaintiff failed to rely on any misrepresentations allegedly made by Defendants in making her decision to accept the Retention Proposal and continue her employment with Pioneer.

### C. Section 502.401 of the Iowa Uniform Securities Act

Although Plaintiff, in her resistance to Defendants' motion, alleges that Defendants violated § 502.401 "with every facet of their scheme of misrepresentation, concealment, and 'back pressure,'" Defendant correctly points out that Plaintiff's claim under this section encompasses only the "easy trigger" allegation. In its June 9, 2003 Order, this Court, in response to Defendants' motion to dismiss, held that Plaintiff had pleaded sufficient facts to make out a claim under § 502.401 based upon the "easy trigger" issue only. The Court held that Plaintiff's factual allegations with respect to the other fraudulent misrepresentations she alleged Defendants had committed [2] were insufficient to state

---

**2.** These included 1) assertions that the options offered under the Retention Plan were roughly equal to or more valuable than benefits under the CIC Plan; 2) failure to disclose the triggering of CIC Plan benefits for Plaintiff and other CIC Plan participants; and 3) failure to make cautionary disclosures to Plaintiff.

a claim, and dismissed Plaintiff's claim under § 502.401 based upon those allegations without leave to amend.

Section 502.401 provides the following:

It is unlawful for any person, in connection with the offer to sell, offer to purchase, sale or purchase of any security in this state, directly or indirectly:

1. To employ any device, scheme, or artifice to defraud;

2. To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

3. To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

■ Defendants argue, and Plaintiff does not disagree, that § 502.401 is Iowa's counterpart to federal Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5, and can be analyzed analogously.[3] *See, e.g., Watts v. Des Moines Register and Tribune,* 525 F.Supp. 1311, 1318 (S.D.Iowa 1981); *see also State ex rel. Goettsch v. Diacide Distributors, Inc.,* 561 N.W.2d 369, 373 (Iowa 1997) (finding that Iowa Code § 502.611 requires Iowa courts to coordinate the interpretation and administration of Iowa's securities laws with related federal regulations). Claims under Rule 10b–5 require proof of four elements: 1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule; 2) causation, often analyzed in terms of materiality and reliance; 3) scienter on the part of the defendants; and 4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security. *In re K–tel International, Inc. Securities Litigation,* 300 F.3d 881, 888 (8th Cir.2002).

Defendants argue that Plaintiff cannot prove two main elements of their claim under § 502.401: reliance and scienter. In response, Plaintiff argues that reliance and scienter are not explicitly required under the terms of § 502.401. Further, Plaintiff argues that even if reliance and scienter are required, there is sufficient evidence in the record to at least create a genuine dispute as to whether Plaintiff can prove those two elements.

1. Reliance

■ As an initial matter, the Court rejects Plaintiff's apparent invitation to find that reliance, because it is not explicitly required by the language of § 502.401, is not in fact a requirement for a claim under that section. The Iowa Supreme Court has made it clear that reliance is an integral component of an action under § 502.401. *See Kramersmeier v. R.G. Dickinson & Co.,* 440 N.W.2d 873, 878–79 (Iowa 1989).

■ "The 'justifiable reliance' requirement ensures that a causal connection exists between the misrepresentation and the plaintiff's injury." *Grubb v. Federal Deposit Ins. Corp.,* 868 F.2d 1151, 1162 (10th Cir.1989). Whether reliance is justifiable depends upon the specific factual situation. *Davidson v. Wilson,* 973 F.2d 1391, 1400 (8th Cir.1992). Plaintiff cannot have justifiably relied on Defendants' alleged misrepresentations regarding the "easy trigger" issue if she disregarded a known risk. *See Grubb,* 868 F.2d at 1163. Although Plaintiff argues that, had she known that Defendants had interpreted

---

**3.** The language of Rule 10b–5 is, in all material respects, identical to that of § 502.401 of the Iowa Code.

the CIC Plan to contain a subjective, easy trigger, she would not have waived her rights under the Plan, the undisputed facts refute Plaintiff's argument. To the extent that Plaintiff did rely on any statements made by Defendants to the effect that the Plan did not contain an "easy trigger," such reliance would have been wholly unjustified in the context of Plaintiff's knowledge at the time she made her decision to sign the Retention Proposal.

At that time Plaintiff accepted the Retention Proposal, Plaintiff knew that whether a CIC Plan participant's own subjective determination of "stated good reason" entitled her to benefits under the CIC Plan, the "easy trigger" issue, was at issue in the *Bublitz* litigation because she had read the *Bublitz* complaint in October of 1999. Additionally, prior to signing the Retention Proposal, Plaintiff had the benefit of two distinct legal opinions as to her rights under the CIC Plan, which she received less than two weeks prior to signing and accepting the Retention Proposal. Plaintiff attended the October 5, 2000 group meeting with lawyers from the Nyemaster firm, who were representing plaintiffs in the *Bublitz* litigation. According to Plaintiff, most of the meeting was spent receiving an update from the Nyemaster attorneys regarding the status of the *Bublitz* class action. Then Plaintiff met individually with attorney Brent Appel on October 10, 2000 to discuss the Retention Proposal. Although Plaintiff did not testify at her deposition to the substance of her conversation with Mr. Appel because of attorney-client privilege concerns, she did testify that she relied on what Mr. Appel advised her during that meeting when making the decision to sign the Retention Proposal. Additionally, Plaintiff's own interpretation of the "easy trigger" issue, based upon her reading of the CIC Plan, was that "all that was needed was for me personally to make a determination that I could no longer perform the duties for which I was hired."

Plaintiff's claim that she justifiably relied on any statements that Defendants made about the "easy trigger" issue is clearly unsupported by the evidence indicating Plaintiff's base of knowledge at the time she signed the Retention Proposal. To the extent that Plaintiff relied upon any representations by Defendants that the CIC Plan did not contain an "easy trigger," Plaintiff was closing her eyes to a known risk. The Court finds that, even giving Plaintiff the benefit of all reasonable inferences, the evidence does not support a conclusion by a reasonable jury that Plaintiff was justified in October, 2000 in relying on any statements made by Defendants indicating that the CIC Plan did not have an "easy trigger."

Second, putting aside whether any reliance by Plaintiff would have been justifiable, Plaintiff's own testimony indicates that she did not in fact rely on any alleged misrepresentations by Defendants on the "easy trigger" issue. This issue was analyzed extensively in the Court's discussion of the validity of Plaintiff's release, *infra* Part II.B.1.f. Plaintiff knew at the time she accepted the Retention Proposal that Defendants' assertions regarding the "easy trigger" issue were in dispute in the *Bublitz* litigation. Plaintiff chose not to take her chances on an uncertain outcome in *Bublitz*, and made her decision to accept the Retention Proposal based upon Tony Cavalieri's assertions that she had a future at Pioneer, her own desire to explore her future job possibilities with Pioneer, and her belief that in order to stay at Pioneer she had to sign the Retention Plan.

### 2. Scienter

█ Although scienter is not explicitly required by the text of the Exchange Act, "it is an acknowledged essential element of

a section 10(b) and Rule 10b–5 claim." *In re K–tel*, 300 F.3d at 893 (citations omitted). The Court, however, need not resolve the dispute between the parties as to whether Plaintiff presented enough evidence to establish a genuine dispute as to scienter for the purposes of summary judgment because the determination that Plaintiff failed, as a matter of law, to show justifiable reliance is dispositive as to Plaintiff's § 502.401 claim.

### D. Violation of Court Order

In a September 26, 2000 Order in the *Bublitz* litigation, this Court ordered that [a]ny communications by Defendants [DuPont and Pioneer] to putative class members on the following subjects must be in writing, filed with the Court, and copied to the Plaintiffs within 24 hours from when they are made:

> (a) the merits, status or effect of [the *Bublitz*] action;
>
> (b) a class member's participation in [the *Bublitz*] action;
>
> (c) settlement or other resolution of the claims and issues presented in [the *Bublitz*] action;
>
> (d) settlement or other resolution of the class members' rights and benefits under the CIC Plan; and
>
> (e) matters that would result in a class member waiving, releasing or compromising his or her rights under the CIC Plan.

Plaintiff argues that conversations she had with Tony Cavalieri, Vice President and Director of the Trait and Technology Department and Plaintiff's self-described "mentor" at Pioneer, and Donna Ramaeker Zahn, a research communications manager at Pioneer and friend of Plaintiff's outside work, violated the Court's order because these oral conversations dealt directly with the Retention Proposal and the CIC Plan. Defendants argue, however, that Plaintiffs cannot make the necessary showing to establish that contempt sanctions should be imposed on Defendants.

#### 1. October 13, 2000 Conversation with Donna Ramaeker Zahn

 It is undisputed that Donna Ramaeker Zahn, at the time of her alleged conversation about the Retention Plan with Plaintiff, was a research communications manager employed by Pioneer. Ms. Ramaeker Zahn was not a member of the Defendants' management team and she never attended any meetings where the Retention Proposal or the CIC Plan were discussed. If either of those subjects came up at a meeting in which Ms. Ramaeker Zahn was in attendance, she was asked to leave the room. Ms. Ramaeker Zahn, in her capacity as a research communications manager, was never asked to communicate anything to Plaintiff about the CIC Plan or Retention Proposal. Plaintiff's family and Ms. Ramaeker Zahn's family were "friends outside of Pioneer." They dined at each other's homes, their children played together, and the families even vacationed together on one occasion.

Plaintiff testified that on October 13, 2000, she had a conversation with Ms. Ramaeker Zahn in which Ms. Ramaeker Zahn was "very aggressive" with her. Plaintiff testified that Ms. Ramaeker Zahn knew somehow that Plaintiff had not yet signed the Retention Proposal and that, during the course of their conversation, Ms. Ramaeker Zahn told Plaintiff that she had to sign the Retention Proposal if she intended to stay at Pioneer, and that, although management was indicating that the Retention Proposal was not a litmus test for loyalty, this was not in fact true. Anyone who did not sign the Retention Proposal would be "gone." Donna Ramaeker Zahn denies ever having told Plaintiff that if Plaintiff wanted to stay at

Pioneer she needed to accept the Retention Plan or that the Retention Plan was a litmus test for loyalty to the organization and that anyone who failed to sign would eventually be removed from the organization. For the purposes of ruling on Defendants' motion for summary judgment, however, the Court will accept Plaintiff's version of the event.

Even if the conversation between Plaintiff and Donna Ramaeker Zahn on October 13, 2000 occurred exactly as Plaintiff has testified, it nonetheless did not violate the Court's September 26th Order. Ms. Ramaeker Zahn was not a member of the Pioneer management team, nor of the management team in Plaintiff's division, and Ms. Ramaeker Zahn was never directed by anyone in a management position for Defendants to speak with Plaintiff about either the CIC Plan or the Retention Proposal. The Court's concern in the September 26th Order was the risk that conversations between the *Bublitz* defendants, in their capacity as employers of putative class members in that litigation, and the putative class members, would be coercive. Plaintiff has testified that Ms. Ramaeker Zahn was "very close" to the management people at Pioneer who were making decisions about the CIC Plan and Retention Plan. However, even assuming this is true, Plaintiff's conversation with Ms. Ramaeker Zahn, a co-worker and friend who was not a member of the management team, was not the type of communication the Court sought to prevent in its September 26th Order.

2. October 13, 2000 Conversation with Tony Cavalieri

Plaintiff also alleges that her conversation on October 13, 2000 with Tony Cavalieri violated the terms of the Court's *Bublitz* Order. Tony Cavalieri was Plaintiff's "long-standing mentor at Pioneer" and she sought him out on October 13, 2000 for advice; specifically, she "had some questions about the direction of Pioneer's research, what [her] role in the organization might look like." Plaintiff has testified that she knew that the Retention Plan would come up before she sought Mr. Cavalieri's advice. At the time she sought the meeting, Plaintiff was aware of the Court's Order in *Bublitz* that Pioneer was not allowed to have oral conversations with putative class members about the Retention Plan.

During the conversation, Plaintiff asked Mr. Cavalieri what he would do in her situation. Mr. Cavalieri told Plaintiff that "for sure he would talk to a lawyer and he would focus on his long-term goals." Plaintiff also disclosed to Mr. Cavalieri her unhappiness with the manner in which the value of her potential options under the Retention Proposal had been calculated. Mr. Cavalieri acknowledged that he was aware of this issue with respect to Plaintiff and other individuals, and that Rick McConnell was trying to get the issue resolved, but that there were "no guarantees whether Rick would be successful or not." Mr. Cavalieri did not make any promises to Plaintiff about the value of her options under the Retention Plan; he merely indicated that individuals in management were aware of Plaintiff's concern and were working on resolving the issue. Finally, Plaintiff and Mr. Cavalieri discussed, at Plaintiff's request, Plaintiff's leadership potential within the organization. Mr. Cavalieri indicated that "he saw a lot of opportunity" for Plaintiff. Plaintiff recalls Mr. Cavalieri "being very supportive, very encouraging, very much suggesting to me that there's a place at Pioneer Hi–Bred for [me]."

In short, in response to Plaintiff's direct solicitation of information from him regarding the Retention Proposal, Mr. Cavalieri declined to offer a specific opinion about the comparative worth of the CIC

Plan and the Retention Proposal and instead advised Plaintiff to talk to a lawyer and consider her long-term goals in making the decision. Although Mr. Cavalieri did offer what Plaintiff believes to be an honest assessment of her future at Pioneer, the Court finds that providing such an assessment to a putative class member does not violate the September 26th Order. The *Bublitz* Order stemmed from the Court's concern regarding coercion. In the Order, the Court specifically addressed the issue of "in-person solicitations," noting that the Court sought to prohibit the Defendants from orally soliciting waivers from putative class members to minimize the possibility of coercion. Taken in context, the Court does not believe that Mr. Cavalieri's conversation with Plaintiff constituted an "in-person solicitation" of a waiver of rights.

With respect to the portion of the conversation dealing with the value of Plaintiff's options under the Retention Proposal, although it might have been more prudent of Mr. Cavalieri to decline to discuss this issue altogether with Plaintiff, the statements Mr. Cavalieri made nonetheless do not constitute a violation of this Court's September 26th Order. Mr. Cavalieri did not promise a favorable resolution of Plaintiff's concern, nor did he indicate that Plaintiff should disregard this concern.

In summary, given the undisputed facts in the record, neither Plaintiff's conversation with Tony Cavalieri nor with Donna Ramaeker Zahn violated the Court's September 26, 2000 Order. Summary judgment is granted to Defendants on this claim.

### E. Violation of § 11 of the Securities Act

In Counts I and III of her Second Amended Complaint, Plaintiff claims that Defendant DuPont violated § 11 of the Securities Act of 1933, 15 U.S.C. § 77k, and § 502.405 of the Iowa Uniform Securities Act by making untrue statements of material fact or omissions of material fact on its 1994 Form S–8 registration statement registering the shares of common stock issued under the DuPont Stock Performance Plan. In her resistance to Defendants' motion for summary judgment, Plaintiff withdrew her claim that Defendant DuPont violated § 502.405 by making material misrepresentations on its registration statement.

 Under § 11, purchasers of a registered security may bring suit against the issuer when false or misleading information is included in a registration statement. *Romine v. Acxiom Corp.*, 296 F.3d 701, 704 (8th Cir.2002) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)). Section 11 imposes a stringent standard of liability to ensure that registration statements are prepared in compliance with the disclosure provisions of the Act. *Id.* To establish a prima facie case for a Section 11 claim, a plaintiff need only show that she bought the security and that there was a material misstatement or omission. *Id.* (citing *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 315 (8th Cir.1997)).

Plaintiff claims that the difference in the vesting periods between stock options under the Retention Proposal, which have a two-year vesting period, and stock options described in DuPont's 1994 Form S–8 registration statement, which have a one-year vesting period, represents a material change and therefore was information that should have been made available to the investor through a post-effective amendment to the registration statement. *See Romine*, 296 F.3d at 706 (stating that a misstatement or omission is material if there is a substantial likelihood that the disclosure of the misstated or omitted fact would have been viewed by a reasonable

investor as having significantly altered the total mix of information made available). Plaintiffs argue that Defendant DuPont's failure to file a post-effective amendment resulted in a material misrepresentation in the registration statement in violation of § 11 of the Securities Act of 1933.

Defendant does not challenge that the vesting term of the options is information that should be made available to the investor; in fact, it is undisputed that DuPont presented such information to potential investors, including Plaintiff, via the materials detailing the terms of the Retention Proposal. Defendant argues that this particular means of disclosure meets SEC requirements and that, under SEC rules and Defendant's own undertakings in the 1994 registration statement, it was not required to file a post-effective amendment. Defendant also claims that the options described in DuPont's 1994 registration statement do not apply to the options that were granted to Plaintiff in 2000. In sum, Defendant claims that Plaintiff's argument represents a fundamental misunderstanding of the Form S–8 registration statement and thus requests summary judgment as a matter of law with respect to Plaintiff's § 11 claim.

Under Item 9(a)(1)(iii) of DuPont's 1994 registration statement, Defendant, as the registrant, undertook in relevant part:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement.

\* \* \* \* \* \*

(iii) To include any material information *with respect to the plan of distribution* not previously disclosed in the registration statement or any material change to such information in the registration statement.

(Emphasis added.) A plan of distribution describes how securities will be distributed to buyers, including identifying the under-writers and brokers, describing the nature of the underwriter's obligation and the relationship of the underwriters to the registrant, underwriters' compensation and indemnification, and any potential fees. *See* Regulation S–K, 17 C.F.R. § 229.500 (2004); *see also In re Initial Public Offering Securities Litigation,* 241 F.Supp.2d 281, 312 (S.D.N.Y.2003). While a plan of distribution is often required in registration statements on SEC forms, registration statements on SEC Form S–8 do not have a plan of distribution section. *Compare* SEC Form S–1 (Part I, Item 8—Plan of Distribution) *and* SEC Form S–2 (Part I, Item 8—Plan of Distribution) with SEC Form S–8 (no Plan of Distribution included). Except in circumstances not present here, the SEC does not require a plan of distribution to be included in Form S–8 registration statement because Form S–8 is a specialized, SEC-prescribed form for registering employee stock option plans. *See* http://www.sec.gov/divisions/corpfin/forms/s–8.htm at General Instructions, ¶ A.1.a.

 Plaintiff argues that the difference in vesting periods between the options offered under the Retention Proposal and those described in the 1994 registration statement was a material change to the plan of distribution which triggered Defendant's obligation to file a post-effective amendment under Item 9(a)(1)(iii). DuPont's Form S–8 1994 registration statement, however, does not contain a plan of distribution. Moreover, nothing in Form S–8 requires Defendant to include a plan of distribution in its registration statement. *See* http://www.sec.gov/divisions/corpfin/forms/s–8.htm (the "Online Form S–8"). Because DuPont's Form S–8 registration statement complies with the SEC's prescribed form and does not contain a plan of distribution, the Court finds that provision 9(a)(1)(iii) does not require

Defendant to file a post-effective amendment.

Nor is the obligation to file a post-effective amendment triggered elsewhere. The registration statement describes those limited circumstances under which DuPont must file a post-effective amendment as occurring only when all securities offered under the 1994 registration statement have been sold, or when DuPont seeks to register all securities offered under that registration that are then remaining unsold. In resistance, Plaintiff disputed this statement, arguing that Defendant's testimony on this point had no basis for authority other than the declaration of Defendant's own corporate counsel. The record shows, however, that Defendant's corporate counsel did testify that the source of this statement regarding the post-effective amendment was the 1994 registration statement. The copy of the 1994 registration statement in the record verifies this testimony. Furthermore, Plaintiff does not dispute Defendant's testimony that neither of the conditions which would trigger the obligation to file a post-effective amendment has occurred since 1994.

The only remaining circumstance which could trigger the Defendant's obligation to file a separate post-effective amendment to the January 6, 1994, Form S–8 registration statement would be if Defendant chose not to disclose material information through other means deemed acceptable under SEC regulations. The SEC rules contain language nearly identical to that included in DuPont's S–K Item 512 undertaking in its 1994 Form S–8 registration statement, which, under the provision Item 9(a)(1), provides that post-effective amendments will be filed under certain circumstances, unless

the registration statement is on Form S–3 (sec. 239.13 of this chapter), Form S–8 (Sec. 239.16b of this chapter) or Form F–3 (Sec. 239.33 of this chapter),

and the information required to be included in a post-effective amendment by those paragraphs is contained in periodic reports filed with or furnished to the Commission by the registrant pursuant to section 13 or section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the registration statement.

See also Regulation S–K, 17 C.F.R. § 229.512, subp. (a) (2004). In other words, under the 1994 Form S–8 registration statement and SEC rules, Defendant could satisfy its duty to file post-effective amendments through otherwise required SEC filings. Thus, Defendant complied with SEC regulations and its own undertakings in the registration statement when it distributed a terms and conditions sheet with the Retention Proposal which described the two-year vesting period of options offered under that grant. See Online Form S–8, General Instructions, ¶ G.1 (updates of plan information must be sent to plan participants, but "need not be filed with the Commission"). Accordingly, the Court finds that Defendant did not omit or misrepresent information to the Plaintiff concerning the vesting periods of the options granted to her.

Finally, the Court finds that any reliance by Plaintiff on information describing the stock options offered in 1994 is misplaced. When describing the options that had a one-year vesting period under the 1994 registration statement, Plaintiff is referring to options described in Exhibit 4(b), which is a form letter included in the 1994 registration statement titled "Terms and Conditions of Stock Options Granted in 1994" that was sent to stock option holders in 1994. While the options offered to Plaintiff in 2000 pursuant to the Retention Proposal's Special One Time Stock Option Grant were being offered under the Dupont Stock Performance Plan, which is the title of the 1994 registration statement, this only means that the Retention Propos-

al options are derivatives of that large pool of stock that was the subject of DuPont's 1994 registration statement. In other words, while the Retention Proposal stock options offered in 2000 and the stock options offered in 1994 are derivatives from the same general pool of stock, they comprise two separate sets of option offerings. Thus, the description of stock option vesting periods found in the letter to stock optionees in 1994 does not apply to the options offered to the Plaintiff under the Retention Proposal in 2000.

Even giving the Plaintiff the benefit of all reasonable inferences, the Court finds that there is nothing in the record to allow a reasonable jury to find that Defendant DuPont was required to file a post-effective amendment. Furthermore, there is nothing in the record that would allow a reasonable jury to conclude anything but that Defendant was in complete compliance with SEC disclosure requirements by disclosing the option terms, including the information regarding the vesting periods, to Plaintiff in the Retention Proposal. Because Plaintiffs have failed to show that there exists a genuine issue of material fact as to whether Defendant misstated or omitted a fact that would have a substantial likelihood of significantly altering the relevant total mix of information available to an investor, summary judgment is granted to Defendant DuPont on Plaintiff's claim that DuPont violated § 11 of the Securities Act of 1933 by failing to file a post-effective amendment.

## III. ORDER

For the reasons discussed, Defendants' motion for summary judgment is hereby granted.

IT IS SO ORDERED.